UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TOMMY BROWN,

        Petitioner,                      Hon. Paul L. Maloney

v.                                        Case No. 1:06-CV-902

THOMAS BELL,

        Respondent.

_____/


## REPORT AND RECOMMENDATION

        This matter is before the Court on Brown's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Brown's petition be **denied**.


## BACKGROUND

        As a result of events which occurred on September 17, 2003, Petitioner was charged with four counts of assault with the intent to commit murder, as well as one count of possession of a firearm during the commission of a felony. Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

**Codi Johnson**

On September 17, 2003, Codi was visiting with her mother, Khimley Young, who lived at 19573 Pelkey Street. (Trial Transcript, February 2, 2004, 71-73). Petitioner and Codi's younger siblings, Porshia Johnson and Kevin Johnson, Jr., also lived at this residence. (Tr. 71-72).

While Codi was upstairs she heard her mother and Petitioner "bickering" about Porshia. (Tr. 73-74, 102). Petitioner was unhappy about "a lot of things that Porshia was doing." (Tr. 102). Codi later went downstairs and observed that her sister was "upset." (Tr. 74-75). Porshia Johnson then exited the house and returned to the living room with three of her friends, Marlin, Chris, and Tony. (Tr. 75-77). Petitioner became angry and told Porshia's friends, "y'all need to leave my house." (Tr. 77-78). Marlin, Chris, and Tony were unarmed and did not argue with, threaten, or approach Petitioner. (Tr. 78). The three young men did not comply with Petitioner's request, however, at which point Petitioner walked to the rear of the house. (Tr. 78-79). Petitioner returned to the living room a short time later and again instructed the three boys to leave the residence. (Tr. 79-80). Khimley told Petitioner that they did not have to leave because it was her house. (Tr. 80). Petitioner returned to the rear of the house. (Tr. 80).

When Petitioner returned to the living room he walked over to Khimley, who was unarmed, and shot her in the shoulder. (Tr. 80-82, 90). Petitioner then shot Young in the stomach. (Tr. 82-83). Petitioner then shot Codi in the leg. (Tr. 83-84). Marlin, Chris, and Tony then ran out of the living room. (Tr. 84). Petitioner chased Chris out of the residence. (Tr. 85). When Petitioner returned to the residence he began firing shots into the air and stated, " I told y'all I was going to get all y'all [motherfuckers]." (Tr. 85).

**Marlin Woodfin**

On the afternoon of September 17, 2003, Marlin was present at Kim Young's residence with Chris Jones and Tony Johnson. (Trial Transcript, February 2, 2004, 131-38). Marlin was sitting on the porch with Chris, Tony, Porshia, Kim, and Petitioner. (Tr. 138). Petitioner and Young later entered the residence and began arguing. (Tr. 140-41). Porshia then entered the residence. (Tr. 141). A short time later, Porshia returned to the porch and asked Marlin, Chris, and Tony to come inside. (Tr. 141-42). The group entered the house. (Tr. 142-44).

Petitioner then entered the living room and instructed Marlin, Chris, and Tony to "get out." (Tr. 145). Kim responded that "they don't have to go anywhere." (Tr. 145). Petitioner responded, "this is my house." (Tr. 145). Kim answered, "no." (Tr. 145). Petitioner then stated, "my name is on the lease." (Tr. 145). Kim responded, "no it is not." (Tr. 145). Petitioner then exited the room. (Tr. 145). When Petitioner returned, he asked Kim whether his name was on the lease. (Tr. 145-47). When Kim answered, "no," Petitioner shot her. (Tr. 147). Marlin, Chris, and Tony then "took off running." (Tr. 147). Petitioner then stated, "I'll kill all y'all." (Tr. 149). Marlin was unarmed and did not threaten Petitioner. (Tr. 150).

**Tony Johnson**

On the afternoon of September 17, 2003, Tony was present at Kim Young's residence with Marlin Woodfin and Chris Jones. (Trial Transcript, February 2, 2004, 174-79). The trio was sitting on the porch when Porshia asked Marlin to come inside the house. (Tr. 179). Tony, Chris, and Marlin then entered the living room with Porshia. (Tr. 179). Kim was also in the living room. (Tr. 182).

Petitioner then told Tony, Marlin, and Chris to leave. (Tr. 183). Kim told them they "didn't have to." (Tr. 183). Petitioner and Kim began arguing about whose name was on the lease. (Tr. 183-84). Petitioner then exited the room. (Tr. 184). When he returned, Petitioner resumed arguing about whether his name was on the lease. (Tr. 184-85). When Kim reiterated to Petitioner that his name was not on the lease, Petitioner shot her. (Tr. 185-86). Tony ran out of the living room, after which he heard Petitioner say "he was going to kill all of us." (Tr. 186-87). Petitioner was the only person with a weapon. (Tr. 211).

**David Soli**

As of September 17, 2003, Soli was employed as an evidence technician with the City of Detroit Police Department. (Trial Transcript, February 3, 2004, 8). At approximately 9:40 p.m. that evening, Officer Soli was dispatched to 19573 Pelkey Street to assist in the investigation of a shooting. (Tr. 8-11). Soli took several photographs within the residence. (Tr. 11-16). As part of his investigation, Officer Soli discovered a 12-gauge sawed-off shotgun laying "on the floor just beside the doorway of the bedroom." (Tr. 16). Soli did not discover any shell casings within the residence, but noted that a revolver, due to its design, would not discharge a casing. (Tr. 18-19). Soli secured the shotgun as evidence. (Tr. 34-35).

Two to three hours later, Officer Soli conducted a gunshot residue test on Petitioner. (Tr. 22-24). Soli indicated that after "six hours" performing a gunshot residue test is "fruitless." (Tr. 24). Officer Soli testified, however, that he believed he performed the gunshot residue test on Petitioner within six hours of the reported shooting. (Tr. 24). The results of the gunshot residue test were positive. (Trial Transcript, February 5, 2004, 17-21).

**Pierre Greene**

As of September 17, 2003, Greene was employed as a City of Detroit Police Officer. (Trial Transcript, February 3, 2004, 45). Sometime that evening, Officer Greene was dispatched to the vicinity of 19573 Pelkey to look for the perpetrator of a shooting. (Tr. 45-46). Approximately four blocks from this location, Greene observed a man who matched the description they had been given. (Tr. 45-48). Officer Greene's partner maneuvered their vehicle next to the man, who Greene identified as Petitioner. (Tr. 48). Petitioner then began to run away. (Tr. 49). Officer Greene quickly captured Petitioner. (Tr. 49). After he was captured, Petitioner told Officer Greene, "those kids were pissing me off and I lost it." (Tr. 50). Petitioner did not, however, make any statement that he had been afraid of anybody or that anybody had threatened him with a weapon. (Tr. 50-51).

**Scott Herzog**

As of September 17, 2003, Herzog was employed as a City of Detroit Police Officer. (Trial Transcript, February 3, 2004, 65-66). Sometime that evening, Officer Herzog was dispatched to 19573 Pelkey to investigate a shooting. (Tr. 66). Upon his arrival, Herzog encountered Kim Young, who had been shot "in the chest and stomach area." (Tr. 66). Officer Herzog also discovered that two other women, Porshia Johnson and her sister, had also been shot. (Tr. 66-70).

**Khimley Young**

On August 28, 2003, Young moved to 19573 Pelkey with her aunt, Petitioner, her son, Kevin, and her daughter, Porshia. (Trial Transcript, February 3, 2004, 78). Petitioner had been Kim's live-in boyfriend for the previous ten years. (Tr. 79).

5

On September 17, 2003, Kim was attempting to "ignore" Petitioner because he was "steady trying to argue all that day." (Tr. 79-80). Later that day three of Porshia's friends, Marlin, Tony, and Chris, stopped over. (Tr. 80-81). The group sat outside on the front porch and did not cause any trouble or create a disturbance. (Tr. 81). Later in the day, Petitioner and Porshia "had words back and forth." (Tr. 82-84). Porshia had attempted to pick up the pieces of a glass Petitioner had broken, but Kim instructed Petitioner to clean it up instead. (Tr. 84). Porshia cleaned up the mess anyway. (Tr. 84). Petitioner then began "fussing." (Tr. 84). When Porshia asked Petitioner "who you talking to," Petitioner responded, "I'm talking to you and your bitch-ass mama." (Tr. 84).

Petitioner then began complaining to Kim that she needed "to get a hold on Porshia." (Tr. 85). Kim "got up and walked out [of] the room." (Tr. 85). Petitioner then told Kim, "I don't want you to eat none of my food, I don't want you to sleep in my bed, I don't want you to touch nothing of mine in here." (Tr. 85-86). Kim "got up and jumped up in [Petitioner's] face" and told him, "do what ever it is you [gonna] do." (Tr. 86). Kim then turned to walk away, but Petitioner grabbed her. (Tr. 87). Kim tried to get away, but Petitioner picked her up and carried her to the bedroom. (Tr. 87-88). Petitioner held Kim down on the bed and tried to choke her. (Tr. 88). Porshia then entered the bedroom and jumped on Petitioner's back and began hitting him in the face. (Tr. 88-89). Petitioner relented and Kim and Porshia exited the bedroom and went to the living room. (Tr. 89).

Porshia then exited the house and returned with Marlin, Chris, and Tony, all of whom were unarmed. (Tr. 90, 106). When Petitioner entered the living room, he told the boys "that they had to leave." (Tr. 90). Kim responded that they did not have to leave. (Tr. 90). Kim and Petitioner began arguing about whose name was on the lease. (Tr. 90). Petitioner then exited the

living room.  (Tr. 90).  When Petitioner returned to the living room, he said, "my name ain't on the lease, huh?" and began firing a weapon.  (Tr. 90-92).  Petitioner shot Kim in the left arm and then the stomach.  (Tr. 92-97).  Petitioner then shot Kim's daughter, Codi, in the leg.  (Tr. 98-99).

Petitioner shot Kim with a handgun belonging to Kim's mother.  (Tr. 101).  This gun was kept in a chest of drawers in Kim's bedroom.  (Tr. 101-02).  Petitioner was aware of the existence and location of this weapon.  (Tr. 102).  This weapon was loaded with ammunition as of September 17, 2003.  (Tr. 103).  Kim also owned a shotgun, which she kept in a plastic bag under her mattress.  (Tr. 102-03).  Kim was unsure whether Petitioner was aware of the location of the shotgun.  (Tr. 103).  Kim did not own ammunition for the shotgun.  (Tr. 103).  Kim never told Marlin, Chris, or Tony about the weapons in her house and they did not enter that portion of the residence prior to Petitioner's attack.  (Tr. 104).

**Ahmed Meguid**

As of September 17, 2003, Meguid was employed as a trauma surgeon at St. John Hospital.  (Trial Transcript, February 3, 2004, 130-33).  On that evening, Dr. Meguid performed surgery to repair the damage caused by the gunshot to Kim Young's abdomen.  (Tr. 133).  The doctor testified that Kim's injuries were very serious and could have been fatal had she not received emergency treatment.  (Tr. 133-38).

**Porshia Johnson**

On the afternoon of September 17, 2003, three of Porshia's friends, Chris, Marlin, and Tony, stopped by her house to visit.  (Trial Transcript, February 3, 2004, 144-48).  The group

sat on the front porch. (Tr. 148). Porshia later entered the residence and walked to her mother's bedroom where she witnessed Petitioner "choking [her] mom on the bed." (Tr. 148-52). Porshia attempted to pull Petitioner off her mother. (Tr. 152). Petitioner eventually relented and Porshia exited the house. (Tr. 152-53).

Porshia asked Marlin "to come in" and "tell [Petitioner] to stop touching [her] mom." (Tr. 153). Porshia, Marlin, Chris, and Tony then entered the residence and went to the living room. (Tr. 153-54). Porshia and her mother began arguing with Petitioner. (Tr. 154). Petitioner then told Marlin, Chris, and Tony to "get out." (Tr. 154-55). Petitioner began arguing with Kim Young about whether his name was on the lease. (Tr. 155). Petitioner then exited the living room. (Tr. 155-56). Petitioner returned a short time later and stated, "my name ain't on no lease and y'all not getting out." (Tr. 156). Petitioner then shot Kim and Porshia with a revolver. (Tr. 156-57). Marlin, Chris, and Tony were unarmed and did not threaten Petitioner. (Tr. 163-64).

**Chris Jones**

On the afternoon of September 17, 2003, Chris, Marlin, and Tony visited Porshia Johnson's residence. (Trial Transcript, February 3, 2004, 185-89). The group sat on the porch and talked. (Tr. 189-90). Porshia later asked Chris, Marlin, and Tony to come into the house with her. (Tr. 130). The group entered the house and stood in the living room. (Tr. 190-91). Petitioner entered the living room and began arguing with Porshia's mother, Kim Young. (Tr. 191-92). Petitioner then told Chris and the other boys "to leave." (Tr. 192). Kim instructed the boys to "stay." (Tr. 192). Petitioner then exited the living room. (Tr. 192-93). When Petitioner returned to the living room he began arguing with Kim about whose name was on the deed to the house. (Tr.

193-95).  Kim repeated to Petitioner that his name "wasn't on the mortgage," at which point Petitioner shot her.  (Tr. 195-97).  Chris then "ran out of the room."  (Tr. 197).  After exiting the living room, Chris heard three more shots fired.  (Tr. 198).  Chris then heard Petitioner state, "I'll kill all y'all."  (Tr. 201).  Chris, Marlin, Tony, Porshia, and Kim were unarmed and never threatened Petitioner.  (Tr. 204).

**Lynette Reed**

As of September 17, 2003, Reed resided at 19566 Pelkey, across the street from the residence at 19573 Pelkey.  (February 5, 2004, 34-36).  That day she heard three or four gunshots, immediately after which she witnessed Petitioner exit the residence at 19573 Pelkey.  (Tr. 36-37).  When Petitioner exited the residence he stated, "I told y'all I was going to kill all y'all motherfuckers."  (Tr. 37).

**Michael Jamison**

As of September 18, 2003, Jamison was employed as in Investigator for the City Of Detroit Police Department.  (Trial Transcript, February 5, 2004, 44-45).  On that day, Officer Jamison interviewed Petitioner following his arrest.  (Tr. 45-47).  Before interviewing Petitioner, Officer Jamison informed Petitioner of his Miranda rights.  (Tr. 47-52).  Petitioner indicated that he understood his rights and was willing to talk with Jamison.  (Tr. 47-52).

Petitioner told Jamison that the three boys (Marlin, Chris, and Tony) "grabbed" him and tried to "throw [him] out of the house."  (Tr. 54-55).  Petitioner stated that he then observed Kim Young holding a weapon.  (Tr. 55).  Petitioner stated that he then "snatched" the gun from Young

and began firing the weapon "at the floor" in an attempt to "empty the gun." (Tr. 55-56). Petitioner asserted that he was not attempting to shoot anybody and that Kim was shot only because she "jumped in the way." (Tr. 56). Petitioner never asserted to Officer Jamison that anybody else was armed or fired (or attempted to fire) a weapon. (Tr. 62-63).

Following the presentation of evidence, the jury found Petitioner guilty of one count of assault with the intent to do great bodily harm less than murder, one count of assault, and one count of possessing a firearm during the commission of a felony. (Trial Transcript, February 6, 2004, 28-31). On the assault conviction, Petitioner was sentenced to time already served. (Sentence Transcript, March 12, 2004, 11). On the convictions for assault with the intent to do great bodily harm less than murder and possessing a firearm during the commission of a felony, Petitioner received consecutive sentences of 40-120 months and two years, respectively. (Tr. 10). Petitioner appealed his conviction to the Michigan Court of Appeals, asserting the following claims:

> I.      Whether the trial court abused its discretion and committed clear error in instructing the jury as to the cognate lesser offense of assault to do great bodily harm less than murder.
>
> II.     Whether several instances of prosecutorial misconduct denied Defendant the constitutional right to a fair and impartial trial.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Brown*, 703 N.W.2d 230 (Mich. Ct. App. 2005). Asserting the same two claims, Petitioner moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Brown,* No. 129198, Order (Mich., Dec. 28, 2005). On December 22, 2006,

Petitioner initiated the present action, asserting the following claims:

> I.  Whether the trial court abused its discretion and committed clear error in instructing the jury as to the cognate lesser of assault with intent to do great bodily harm less than murder.

> II.  Whether several instances of prosecutorial misconduct denied Petitioner the constitutional right of a fair trial and impartial trial.

## STANDARD OF REVIEW

Brown's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law

when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S.

at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

In certain circumstances, however, the deferential standard articulated above does not apply. First, if the state court resolves a particular claim but fails to articulate its analysis, the Court must apply "modified AEDPA deference." *Vasquez v. Jones*, 496 F.3d 564, 569-70 (6th Cir. 2007). Under this standard, "the court conducts a 'careful' and 'independent' review of the record and applicable law, but cannot reverse 'unless the state court's decision is contrary to or an unreasonable application of federal law.'" *Id.* at 570. However, where the state court has altogether failed to review a particular claim, such is reviewed de novo. As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). In such circumstances, the court conducts a *de novo* review. *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins*

established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

**I.**        **Jury Instruction Claim**

Petitioner was charged in this matter with four counts of assault with the intent to commit murder. The jury was instructed as to this offense, but were also instructed that they "may also consider the lesser charge of assault with intent to do great bodily harm less than murder," as well as "the lesser charge of assault." (Trial Transcript, February 6, 2004, 10-15). As previously noted, Petitioner was not convicted on any count of assault with the intent to commit murder, but was instead convicted of one count of assault with intent to do great bodily harm less than murder and one count of assault. Petitioner asserts that the trial judge erred by instructing the jury as to the lesser offenses of assault and assault with intent to do great bodily harm less than murder.

On appeal before the Michigan Court of Appeals and the Michigan Supreme Court, Petitioner presented this issue as a violation of state law only. Petitioner did not assert that the jury instructions in this matter violated federal law or the United States Constitution. Petitioner did not assert that the jury instructions violated his right to due process or to a fair trial. Likewise, Petitioner did not cite to or rely upon any authority which could reasonably be interpreted as indicating that he was asserting a violation of federal law or any rights he enjoys under the United States Constitution. Instead, Petitioner asserted only that the jury instructions in this matter violated Michigan law. The question then becomes whether Petitioner has asserted in this Court that the challenged jury instructions violated "the Constitution or laws or treaties of the United States," *see* 28 U.S.C. 2254(a), or simply that such violated state law.

In his pleadings in this Court, Petitioner reiterates that the jury instructions in question violated Michigan law. Petitioner has not asserted that the instructions violated federal law or the United States Constitution. Petitioner has not asserted that the instructions violated his right to due process or to a fair trial. Moreover, Petitioner has neither cited to nor identified any authority which could reasonably be interpreted as indicating that he was asserting a violation of federal law or constitutional right. Petitioner cannot, however, obtain relief in this Court based upon perceived violations of state law. *See* 28 U.S.C. 2254(a). Accordingly, the undersigned recommends that Brown's petition for writ of habeas corpus be denied.

Even if Brown's petition is interpreted as asserting a violation of federal law, the result is the same. The Court first notes that to the extent Petitioner's claim is interpreted as implicating federal law, such cannot form the basis for the relief Petitioner seeks, because he has failed to properly exhaust such in state court.

Federal law provides that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that. . .the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). The purpose of the exhaustion requirement is to give the state courts the first opportunity to "pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). To provide the State with the requisite opportunity, the petitioner must "fairly present" the substance of his claim "in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted).

The fair presentation requirement is not satisfied where the petitioner simply makes in the State court "a general appeal to a constitutional guarantee as broad as due process" or only identifies "the facts necessary to state a claim for relief." *Gray v. Netherland*, 518 U.S. 152, 163 (1996). The petitioner "must present his claim to the state courts as a federal constitutional issue - not merely as an issue arising under state law." *Collins v. Wells*, 1994 WL 64702 at *3 (6th Cir., Mar. 1, 1994) (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)). However, the petitioner is not required to "recite a specific sequence of words to fulfill the exhaustion requirement, nor is there some sort of threshold requirement whereby Petitioner must dedicate a certain number of words to analysis of federal law," as simply "[l]abeling a claim as a federal claim is sufficient." *Daniels v. Lafler*, 192 Fed. Appx. 408, 418 (6th Cir., Aug. 4, 2006) (citing *Baldwin*, 541 U.S. at 32).

As discussed above, Petitioner's presentation in the state courts of this claim does not satisfy the fair presentation requirement. Petitioner has, therefore, failed to properly exhaust this claim. Petitioner's failure to exhaust this claim notwithstanding, it may nonetheless be denied on the merits. *See* 28 U.S.C. § 2254(b)(2).

Because Petitioner's claim rests upon a perceived violation of state law, relief is available only if the alleged error deprived Petitioner of "fundamental fairness in the trial process." *Serra v. Michigan Department of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993); *see also*, *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (to obtain relief in a collateral proceeding, the petitioner must demonstrate that the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely [that] the instruction is undesirable, erroneous, or even universally condemned").

The Court fails to discern how the challenged jury instructions rendered Petitioner's trial fundamentally unfair.  Petitioner does not challenge the accuracy of the instructions, only their applicability, which, as Respondent asserts, was appropriate under Michigan law.  Furthermore, the evidence presented at trial overwhelmingly supports Petitioner's convictions for both assault with intent to do great bodily harm less than murder and assault.  Accordingly, this claim raises no issue on which habeas relief may be granted.

**II.        Prosecutorial Misconduct**

Petitioner asserts that his right to a fair trial was violated by "several instances" of prosecutorial misconduct.  Specifically, Petitioner argues that the prosecutor improperly offered, during the course of trial, to adjourn the proceedings so that a shotgun could be tested for fingerprints.  Petitioner also makes reference to "a number of times" in which the prosecutor improperly shifted the burden of proof.

A.        Fingerprint Offer

As noted above, during his investigation of the residence where the shootings occurred, Officer Soli discovered a 12-gauge sawed-off shotgun laying "on the floor just beside the doorway of the bedroom."  On cross-examination, Petitioner questioned Officer Jamison about the fact that the shotgun had not been examined for fingerprints.  During this discussion, the following exchange occurred between Petitioner's counsel and Officer Jamison:

> Q:        And you know that you had the ability to request
> fingerprints on this gun; is that correct?
>
> A:        Yes, I did.

Q: In fact, even after the trial started you could have sent it over to the lab, and in fact you could probably still do it now, couldn't you?

A: Yes.

Q: But it wouldn't make any sense now because you and I have touched it?

A: Yes.

Q: But they could still have somebody else['s] fingerprints?

A: That's correct.

Q: And if you chose you, you could do it right now?

A: Yes, I could.

Q: You just chose not to?

A: Would you like me to?

Q: It's not my call.

(Trial Transcript, February 5, 2004, 72).

At this juncture, the prosecutor interjected that "[i]f Mr. Cunningham wants to adjourn the trial to do it, we [c]an do it, you Honor." (Tr. 72). Petitioner's counsel agreed, stating that, "I would ask that we do that, your Honor." (Tr. 72). The trial judge then excused the jury and discussed the matter with Officer Jamison. (Tr. 73-77). When asked "what would be the likelihood of getting a good clear print on that particular weapon?", Officer Jamison responded "not likely at all." (Tr. 76). The trial judge then stated the following:

All right. There's the argument that has been raised during the course of the entire trial concerning the fact that the gun was not originally printed.

> At this time from the testimony of the detective and the facts involved about how many people handled the gun and where it's been, that it's not likely that the gun is going to prove one way or the other who may have handled that gun on September 17, 2003.
>
> So the prints weren't taken. It's in the middle of the trial. The gun has been handled by a number of people. And it would appear that to print the gun now would almost be a[n] exercise of futility and not prove who may have handled the gun or who may not have handled the gun on September 17, 2003.
>
> So I'm going to deny the request. If there really was a request, Mr. Cunningham to have the gun printed at this time.

(Tr. 76-77).

When the jury returned, the trial judge questioned Officer Jamison about the likelihood that fingerprints could be obtained from the shotgun at this point in time. (Tr. 86-90). Officer Jamison reiterated that there was "[n]ot a good likelihood at all" that a useable fingerprint could be obtained from the shotgun at this juncture. (Tr. 90). The trial judge then denied the request to have the gun tested for fingerprints. (Tr. 90-91). The trial judge also reminded the jurors that statements or questions by the attorneys did not constitute evidence and must be disregarded. (Tr. 91). Petitioner asserts that the prosecutor's offer to adjourn the trial so that the shotgun could be tested for fingerprints constitutes prosecutorial misconduct.

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor." *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). Thus, even if the

challenged comments were improper, habeas relief is available only where the comments "were so flagrant as to render the entire trial fundamentally unfair." *Gillard*, 445 F.3d at 897.

When assessing whether an improper comment resulted in a denial of the right to a fair trial, the Court considers the following factors: (1) the likelihood that the comments mislead the jury or prejudiced the accused; (2) whether the comments were extensive or isolated; (3) whether the remarks were deliberately or accidentally presented to the jury; and (4) whether the evidence against the accused was substantial. *Id.*

An examination of these factors persuades the Court that relief is not appropriate. The Court fails to discern how the exchange in question prejudiced Petitioner. The fingerprint issue was of minimal significance in this matter, as there was no evidence that any of the other individuals present at the time of the shooting handled the shotgun. The comments in question were isolated and, furthermore, the evidence against Petitioner was simply overwhelming. The Michigan Court of Appeals rejected this particular claim, finding that

> Nor was defendant denied a fair trial as a result of the prosecution's offer to adjourn the trial for fingerprinting of a shotgun found at the scene of the shooting. Defendant argues that this offer to adjourn improperly implied that the defense, should it reject the offer, had something to hide from the jury. However, we note that counsel for defendant accepted, rather than rejected, the offer to adjourn the trial for fingerprinting of the shotgun. Moreover, although the trial court refused to grant an adjournment for this purpose, it did so only after determining, on the basis of testimony offered before the jury, that the likelihood of obtaining any useful evidence from fingerprinting of the weapon was slight.

*People v. Brown*, 703 N.W.2d 230, 239 (Mich. Ct. App. 2005).

The decision by the Michigan Court of Appeals rejecting this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law.

Furthermore, this decision is not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

### B. Burden Shifting

In his pleading before this Court, Petitioner asserts that the prosecutor improperly shifted the burden of proof. However, Petitioner has failed to identify any specific instance in which such occurred. Instead, Petitioner simply makes the unsupported assertion that the prosecutor engaged in such behavior. While Petitioner has not referenced or incorporated the pleadings he filed in the state courts below, the Court will consider such pleadings in an attempt to discern the basis for this particular claim.

In his state court pleadings, Petitioner asserted that the prosecutor "continually attempted to elicit testimony which implied that Defendant never previously raised the issue of self defense." In support of this argument, Petitioner cited to the following exchanges, the first of which occurred between the prosecutor and Tony Johnson:

> Q:    Did you hear [Petitioner] say that at the same exact time he said, I'll kill all y'all or I'll kill all of you, or was it as a different time?
>
> A:    A different time.
>
> Q:    Now at any time while Mr. Cunningham was questioning you, did he ever ask you if you had something else in your hand besides a shot- -

(Trial Transcript, February 2, 2004, 206).

Petitioner also cites to the following exchange which occurred between the

prosecutor and Khimley Young:

> Q: And then you said, okay that's when the gun discharged he didn't shoot me at all?
>
> A: Being sarcastic then.
>
> Q: Did he cross examine you about that question today?
>
> A: Not today - - yes, he did. Yes.
>
> Q: Did he cross-examine you about [the] next question: He didn't intend to shoot you in the stomach with the gun? Answer; yes he did? Did he ask you about that today or did he just leave off - -

(Trial Transcript, February 3, 2004, 125).

  Even if the comments in question were somehow inappropriate, such did not render Petitioner's trial fundamentally unfair. These comments were isolated occurrences over the course of a five day trial. The trial judge properly instructed the jury that "[t]he defendant is not required to prove his innocence or do anything" and "[t]he prosecutor must prove each element of the crime beyond a reasonable doubt." (Trial Transcript, February 6, 2004, 5). The Court fails to discern how these comments prejudiced Petitioner. There is no evidence that the prosecutor acted with the intent to prejudice Petitioner or violate his right to a fair trial. Finally, the evidence against Petitioner was overwhelming. The Michigan Court of Appeals rejected this particular claim, finding that

> Here, we conclude that, when considered in context, the questions and remarks at issue were not intended to either shift the burden of proof or to denigrate defense counsel and did not deny defendant his right to a fair trial.
>
> Initially, we note that, although suggested as a possible basis for the shootings in both opening argument and during questioning by defense counsel during trial, self-defense was never expressly argued as justification for the shootings at issue. Rather, it was argued by defense counsel that the shootings, although prompted by a concern

for safety, were accidental. Accordingly, we discern no prejudice to defendant arising from the prosecution's emphasis of any failure by defense counsel to establish that the shootings were done in self-defense. The prosecutor's questions did not shift to defendant the burden of proving his innocence, but properly attacked the credibility of defendant's theory that the shootings were prompted by a fear for his safety. Moreover, to the extent that the questions and comments at issue might have been misinterpreted by the jury, we find that the curative instructions given by the trial court were sufficient to dispel any prejudicial effect. The jury was properly instructed that the prosecution solely possessed the burden of proof in this matter. In addition, the trial court emphasized to the jury that the lawyers' questions, comments, and arguments were not evidence; rather they were only a means to assist the jury in understanding the evidence and legal theories of both parties. Because the trial court provided sufficient curative instructions to the jury, we find that defendant was not denied a fair trial.

*People v. Brown*, 703 N.W.2d 230, 239 (Mich. Ct. App. 2005) (internal citations omitted).

The decision by the Michigan Court of Appeals rejecting this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision is not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Brown's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C).

Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  January 26, 2010

 /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge